# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 12, 2014

## WILLIAM CHARLES ANGEL, JR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Giles County**
No. 15702    Robert L. Jones, Judge

---

**No. M2013-02659-CCA-R3-PC - Filed January 29, 2015**

---

The Petitioner, William Charles Angel, Jr., appeals the Giles County Circuit Court's denial of post-conviction relief from his guilty plea to three counts of first degree premeditated murder (counts 1, 2, and 3), three counts of first degree felony murder (counts 4, 5, and 6), one count of aggravated arson, one count of setting fire to personal property, one count of aggravated burglary, one count of theft under $500, and one count of aggravated cruelty to an animal, for which he received an effective sentence of life imprisonment without parole. He argues that his convictions were based upon a coerced confession to law enforcement and that he received ineffective assistance of counsel, which rendered his guilty plea involuntary. Upon review, we affirm the judgment denying post-conviction relief. However, because the judgments of conviction in this case fail to reflect the merger of the first degree premeditated convictions with the surviving first degree felony murder convictions, we vacate the judgments in counts 1 through 6 and remand the case for entry of three judgments of conviction showing that count 1 was merged with count 4, count 2 was merged with count 5, and count 3 was merged with count 6.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded for Entry of Corrected Judgments**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, for the Petitioner, William Charles Angel, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Michael Bottoms, District Attorney General; and Lawrence R. Nickell, Jr., Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

On January 15, 2010, the Petitioner was indicted for three counts of first degree premeditated murder, three counts of first degree felony murder, one count of aggravated arson, one count of setting fire to personal property, one count of aggravated burglary, one count of misdemeanor theft, and one count of aggravated cruelty to an animal. At the plea submission hearing on January 31, 2011, the Petitioner acknowledged that the following synopsis of facts relating to his charges was mostly true:

On the night of October 22, 2009, Matthew Wood asked to borrow a gun with which to kill Jarrod Thornton, and indeed had previously stated his intent to kill him to friends. Matthew Wood thought Jarrod Thornton was seeing his girlfriend. Jarrod Thornton was not [seeing Wood's girlfriend]; someone else was.

Matthew Wood told [the Petitioner] that they ([the Petitioner] and Wood) were going to burn the Thornton home and together left [the Petitioner's] home taking a gas container with them to do so. When told by Wood that they were going to do this [the Petitioner] replied that he did not care. They stopped on the way and filled the container. At the Thornton home they parked [the Petitioner's] mother's vehicle in a field off the roadway out of sight and two hundred and sixty yards from the house. They then walked to the house carrying the gas. Both walked around the house looking in the windows and observed Desere Thornton to be awake. Wood announced to [the Petitioner,] "[W]e're going to kill them all."

They entered the residence by going through a window. Wood was armed with a folding knife that had been taken from Richland School. He, with this knife, attacked and mortally wounded Jarrod Thornton (age 16).

He first stabbed the mother (Desere) who managed to run from the home with the younger brother Anthony (age 9) through the yard to their vehicle but they were unable to get away before Wood pulled Desere from the vehicle stabbing her again, also cutting her throat. [The Petitioner] then caught Anthony who had run from the vehicle while his mother was being attacked in the yard. [The Petitioner] held Anthony while Wood stabbed and cut his throat–all the while Anthony was crying "STOP"– "IT HURTS!"–"PLEASE STOP!"–"DON'T KILL ME, I'M JUST A LITTLE BOY!"

-2-

Wood carried Anthony from the yard into the house. Wood and [the Petitioner] both carried Desere into the house. As she was being carried she was gasping and trying to breathe. Wood poured gasoline over Jarrod, Desere and Anthony, and then decided that they did not have enough gasoline. After [the Petitioner] loaded an X-Box and DVD's into their vehicle from the house, they went to Richland Market and bought more gasoline using Wood's debit card. Upon returning, they poured gasoline for the second time. They then went into the yard and doused the Thornton['s] vehicle interior with gasoline, along with the family dog who had r[un] to and jumped inside with Desere and Anthony and had been shut up there. The house was then set ablaze by Wood who when doing so was blown off the porch and burned by the exploding gasoline. [The Petitioner] and Wood then set the Thornton's vehicle on fire. The dog managed to get out but died later as a result of burns sustained in the fire.

At autopsy the three victims were determined to have been stabbed. Anthony and Desere's throats were determined to have been cut. This was still discernable even after they had been subjected to the fire. The autopsy established, by Carbon Monoxide levels (29% for Jarrod, 34% for Desere, and 37% for Anthony), that all three victims were burned alive.

During the investigation eleven blood samples were obtained from [the Petitioner's] mother's vehicle. These samples revealed Wood's blood to be co-mingled with victims Jarrod and Desere Thornton's blood (by DNA testing).

Wood, while stabbing or cutting the victims, had cut himself on the inside right wrist and wrapped this cut with one of Jarrod Thornton's soccer socks which was found later at [the Petitioner's] house with Desere and Wood's blood on it (by DNA testing).

Wood's only real statement is in the form of his allocution to the court upon his guilty plea.

In [the Petitioner's] statement he says that he threw his clothes into the fire (house) after they became blood soaked, because he didn't want to get caught. Also in his statement he relates how he held Anthony while Wood killed him and what Anthony said while being killed but then he states that he "didn't do anything," "Matthew did it all." [The Petitioner] also stated that his answer was "okay" when Wood said "we're going to kill them all" before

-3-

going in the window. Thus he establishes a degree of culpability approaching that of Wood.

The Petitioner entered a guilty plea to the charged offenses. The plea agreement, which was accepted by the court, merged the three convictions for first degree premeditated murder with the three convictions for first degree felony murder and required the Petitioner to serve an effective sentence of life without the possibility of parole.

On January 30, 2012, the Petitioner filed a pro se post-conviction petition, alleging that his convictions were based on the use of a coerced confession, his guilty plea was involuntary, he was denied effective assistance of counsel, and his convictions violated the protections against double jeopardy. On December 18, 2012, appointed counsel filed an amended petition, alleging that the Petitioner was denied effective assistance of counsel and that the Petitioner was denied his right to counsel and his right against self-incrimination because he was not properly advised of his Miranda rights,  because he did not understand his Miranda rights, and because he failed to waive his Miranda rights.

**Post-Conviction Hearing.** At the October 14, 2013 post-conviction hearing, the following exhibits were entered into evidence:  the transcripts of the Petitioner's interviews with law enforcement, the audio recordings of these interviews, the copy of the Petitioner's handwritten statement, the transcript from the plea submission hearing, the synopsis of the facts underlying the offenses, the three letters from the district attorney to the public defender regarding the State's offer of life without parole, and the video recording of the Petitioner's interview while at the crime scene.

Jennifer Noller, the Petitioner's mother, testified that she and the Petitioner, who was a high school student at the time, first encountered Investigator Michael Chapman at the hospital when the Petitioner was receiving treatment for his burns in the early morning hours of October 23, 2009. At Investigator Chapman's request, Noller and the Petitioner drove to the Giles County Sheriff's Office to talk about whether the Petitioner was involved in the crimes in this case. Upon arriving there, Noller and the Petitioner were interviewed together, and Noller was interviewed separately several times. Noller said Investigator Chapman talked to her about persuading the Petitioner to tell the truth about what happened regarding the offenses, which she agreed to do. The audio recording of Investigator Chapman's interview with Noller and his subsequent interview with Noller and the Petitioner, which began at 8:20 a.m. on October 23, 2009, was played during the hearing.

Prior to the 8:20 a.m. interview, the Petitioner denied being involved in the fire at the victims' property and claimed that he and Matthew Wood had been burned from a bonfire at a different location. At some time before this interview, Noller, the Petitioner, and Investigator Chapman went to the location where the Petitioner claimed the bonfire had been, but there was no evidence of a bonfire. Noller, believing that the Petitioner was merely present when Wood committed the crimes, later tried to convince the Petitioner to tell the truth because she was afraid he would be punished as severely as Wood for Wood's crimes. Noller urged the Petitioner to tell the truth because she "didn't want to lose him to jail or to whatever was happening or whatever could have happened at that time . . . if he was put in for murder."

Noller was allowed to be alone with the Petitioner when she handwrote his statement. She asked the Petitioner what happened the night of the offenses, and she wrote down exactly what he told her. She acknowledged that the Petitioner initially told the story about being burned in a bonfire to deceive law enforcement. At first, Noller believed that Investigator Chapman was going to ask them some questions and then allow the Petitioner to return home. She admitted that Investigator Chapman never told her the Petitioner would not be prosecuted for the offenses in this case.

The Petitioner testified that he was receiving treatment for his second degree burns at the hospital when he first encountered Investigator Chapman. He later went with his mother to the sheriff's office to talk to Investigator Chapman. During the ensuing interviews, the Petitioner initially denied being involved in the crimes in this case. However, he later told Investigator Chapman the truth about what happened after Investigator Chapman informed him that he would be "[a] witness to the case" instead of going to jail for the rest of his life and being convicted of murder. The Petitioner said that his mother, who was crying and telling him that he would have to live in prison for the rest of his life or die if he did not tell the truth, impacted his decision to talk to Investigator Chapman. When he began telling Investigator Chapman what happened, he did not believe he was going to jail and thought he would be able to go home because he was going to be a witness.

The Petitioner said he might have taken a Lortab for the pain from his burns prior to his interviews with Investigator Chapman. He also said he had been awake for approximately twenty-four hours by the time Investigator Chapman interviewed him. The Petitioner stated that although Investigator Chapman read him his Miranda rights, they did not talk about what these rights meant. He did not recall actually agreeing to waive his Miranda rights before talking with Investigator Chapman.

The Petitioner stated that he should have been informed of the possibility of suppressing his statements and that if he had known of this possibility, it would have affected

-5-

his decision to plead guilty. The Petitioner claimed that appointed counsel, the public defender, never talked to him about suppressing his statements to law enforcement. He said he now understood that his statements potentially could have been suppressed, even though there was no guarantee they would have been suppressed. The Petitioner stated that there were never any discussions with his attorneys about possible appeal issues in the event that he was convicted at trial. Instead, he said it was counsel's position that he could either take the plea and receive a sentence of life without parole or "go to trial and get the death penalty[.]"

The Petitioner acknowledged that counsel, the public defender, met with him "a lot of times" but could not confirm that she met with him forty-six times. He also acknowledged that he met with co-counsel "a couple few times" and met with another attorney in the public defender's office as well. He said counsel told him that she had listened to the statements he made to law enforcement. Although he acknowledged that counsel told him his statements could hurt his case, he claimed she never talked to him about attempting to suppress these statements so they could not be used against him at trial.

The Petitioner did not recall talking to counsel about the video recording of his interview with Investigator Chapman at the crime scene. However, he did remember seeing a copy of his statement that was written down by his mother. He said counsel never discussed with him the circumstances under which he gave those statements. The Petitioner said counsel told him that the State's offer had a deadline, which meant he had a small amount of time to decide whether he wanted to file motions regarding his case. He said he had one month from the date the prosecutor made the offer to decide whether he would proceed to trial or accept the offer of life imprisonment without the possibility of parole.

The Petitioner admitted that he knew enough about what was happening during his interviews to lie and claim that he had received his burns from a bonfire at the creek in an attempt to throw Investigator Chapman off of his trail. He knew he was in serious trouble because of what he had done at the crime scene. Although the Petitioner claimed he thought he would simply be a witness for the State, he admitted that he was a perfect witness because he had seen everything Matthew Wood had done at the crime scene. The Petitioner acknowledged that Investigator Chapman never told him that the State was not going to prosecute him. He further acknowledged that he had said he was satisfied with counsel's assistance at his plea submission hearing. The Petitioner admitted that the State had sought the death penalty in his case and that he had chosen to accept the State's offer of life without parole. He recalled telling the trial court at the plea submission hearing that he understood the rights he was waiving and that he was entering his guilty plea because it was in his best interest. He also recalled signing a synopsis regarding his actions on the night of the offenses and admitting to the trial court that most of the synopsis was true prior to entering his guilty

-6-

plea. The Petitioner admitted that he never told Investigator Chapman that he was under the influence of alcohol or drugs at the time of his interviews.

Counsel testified that she was the elected public defender for the district and that her office had been appointed by the general sessions judge to represent the Petitioner. She first met and interviewed the Petitioner at the Giles County Jail on October 26, 2009, just a few days after the crimes occurred. Her notes showed that she had met with the Petitioner a total of forty-six times during the representation. Counsel said that she and two assistant public defenders were specifically assigned to represent the Petitioner. One of these attorneys was co-counsel, who had been an attorney in the public defender's office since approximately 2000. The other attorney, who had since retired from the public defender's office, was the most experienced attorney in the office because he had handled twenty-five death penalty cases and had previously been the public defender in Dickson County. She said that this assistant public defender was first chair and she and co-counsel acted as second chair on this case and that all three of them were qualified to handle death penalty cases under the Supreme Court Rules.

When counsel first met with the Petitioner, she learned that Investigator Chapman had interviewed the Petitioner and that the Petitioner had initially claimed he had received his burns from a bonfire. The Petitioner said he later told the truth about what happened so that he would not be blamed for something he did not do. She said the Petitioner believed he had not done anything wrong because he had not stabbed the victims. Counsel said she remembered telling the Petitioner that his confession to law enforcement would be used against him. They reviewed his statements together. The Petitioner explained that his mother was present during his interviews because he had wanted her there. He said he asked his mother to write his statement because he thought it would be clearer than if he wrote it. Counsel said that she later saw samples of the Petitioner's writing and that "he could write well" and was able to express himself fully whenever she talked to him. She stated that she received transcripts and copies of all the videotaped interviews and that she "read and listened to every word."

Counsel said that the State had filed a notice of its intent to seek the death penalty in the Petitioner's case. However, the State later informed her that it was considering making an offer of life imprisonment without the possibility of parole if the Petitioner testified truthfully against Matthew Wood. She personally believed, after knowing the Petitioner for more than a year, that the defense would have been able to avoid the death penalty at trial. However, she said, "[T]he consequences of going to trial are so serious, and you can never take anything for granted." On October 6, 2010, the State gave them a final offer and informed them that the offer would be withdrawn on October 15, 2010. When that date

-7-

arrived, counsel asked for additional time, and the deadline was extended to October 26, 2010.

Around the time that counsel received this offer, she talked to the medical examiner who performed the victims' autopsies. The medical examiner told her, as was reflected in his report, that the victims could have recovered from their stab wounds if they had received timely medical attention and that the victims' causes of death were smoke inhalation following the stabbings. Counsel said that if the Petitioner and Wood had not dragged the victims back into the house and set the house on fire, the victims might have survived their stab wounds.

Counsel did not know if she ever used the word "suppression" when she talked to the Petitioner about his statements but asserted that she explained the possibility that the State might not be able to use his statements against him. She said that the Petitioner's case was never set for trial and that her co-counsel was prepared to file forty-five or fifty additional motions, including a motion to suppress, if the Petitioner proceeded to trial.

She stated that one of problem with the Petitioner's statements was that Investigator Chapman approached the Petitioner while the Petitioner was being treated at the hospital. In addition, she noted that at the time of the statements, the Petitioner had not slept or eaten and was in pain from his burns. However, she acknowledged that the Petitioner, after being treated at the hospital, had voluntarily gone to the sheriff's office with his mother and talked to law enforcement. When asked if she thought Investigator Chapman's comments to the Petitioner about being a witness and protecting him were a potential suppression issue, she stated:

> We heard that when we heard those tapes. I've heard that on many other occasions when police and detectives have questioned suspects. It's not uncommon. He didn't, in my opinion, he didn't make any promises. He didn't make any, what you would call, real threats. He's an experienced detective and I think he was as careful as anyone I've ever heard. His reputation stands for his work.

However, she would "have made [Investigator Chapman's comments about being a witness] as big a suppression issue as [she] possibly could have had [they] gone to trial." When asked if she believed these comments were a legitimate issue for a motion to suppress or appeal, she stated, "Without the benefit of the extensive research we would have done on that issue, I can't answer that question."

Counsel acknowledged that the Petitioner's statements were a substantial part of the State's case against him and that there was a potential issue that all of his statements were tainted as fruit of the poisonous tree. However, she said the State had other evidence against the Petitioner, including physical evidence of the house that burned down and the victims' bodies, circumstantial evidence that the Petitioner and Wood were treated for their burns shortly after the offenses, forensic evidence consisting of Tennessee Bureau of Investigation lab reports and reports from the medical examiner regarding the victims' causes of death, and evidence from classmates of the relationship between Wood and the Petitioner and of Wood's motive to hurt the older child victim and his family. She agreed that if not for the Petitioner's statements, the State would not have known that the Petitioner held the young boy while Wood stabbed him, that he helped drag the mother out of the car as she was trying to escape, that he helped drag the mother and the youngest child back to the house after they were stabbed, and that he threw the cardboard in the car so that it would burn.

Counsel stated that they were aware that a trial date would be set and that Wood would be tried first and the Petitioner would be tried two or three months later. When asked if she believed that knowing whether the Petitioner's statements could be used at trial would have been important for the Petitioner to decide whether to plead guilty, counsel said she and the other two attorneys explained this issue to him prior to his entering his guilty plea. She stated that all three attorneys talked to the Petitioner about the possibility of suppressing his statements and how that related to his decision to plead guilty. She also stated that she was present when the assistant public defender serving as first chair talked to the Petitioner about the risks of proceeding to trial:

> The analysis for [the assistant public defender] was that the evidence was very strong against him for felony murder particularly, and the fact that the medical examiner had determined that each of the victims died of smoke inhalation would have been very damning to him since he was there and participated. He was inside the house when [the older child victim] was killed. He was inside the house when the mother was stabbed. He held the young boy . . . while Mr. Wood stabbed him. He assisted in extricating the mother and child from the car. He threw the cardboard into the car, which caused it to explode. The fact that he had gone with Mr. Wood, stopped at the market to get the gas can filled with gasoline, hidden the gas can, stalked the house, assessed the situation, he was there right beside Mr. Wood, that they returned after they had stabbed the victims because–now, this is all because of a statement by [the Petitioner]. I have no way of knowing if it's true or not. But they didn't have enough gasoline to do the job the way Mr. Wood envisioned it, and so they went back to the gasoline station and got another can of gas and then went back to the scene. Those things would have been very damning and

could very well have resulted in [the Petitioner's] being sentenced to the death penalty for his participation in the deaths of those three victims.

Counsel stated that pleading guilty was the best way for the Petitioner to avoid a sentence of death. She explained, "When the death penalty is a possibility, it is a very–it's the most serious risk you take in going to trial. If you can avoid that, in my opinion, it's always an advantage." She said that she was not sure that the attorney serving as first chair ever talked to the Petitioner about the possibility of suppressing his statements as a part of trial strategy when they were discussing the State's offer. Counsel said that the Petitioner "was vulnerable . . . [t]o being convicted because his attitude always was I just want to go home, I just want to go back to school, I haven't done anything, I didn't stab anybody." She said that it would have been extremely risky if the Petitioner had declined the State's offer:

> As you know, every case turns on its own facts, and the facts in this case were not good for [the Petitioner]. Had we been able to suppress the confession and suppress the video, then we would have had a much stronger case going to trial than we had if we were not able to suppress those things. And I mean it's a risk I wasn't willing to take to say, look, don't take this plea, you know we can go in there and we're good lawyers, we'll do our best, we're going to do our research, we're going to get all these experts, and we're going to prove that that confession was coerced. I'm not about to do that unless I fully believed it, but I didn't fully believe that [the Petitioner's confession was coerced] based on the information I had at the time.

She also noted that the Petitioner "never showed any remorse" about the crimes.

Counsel said that she and Wood's attorneys did not discuss their respective clients' cases, although she did disclose the medical examiner's report to Wood's attorneys. During the plea negotiations in the Petitioner's case, counsel believed that Wood would proceed to trial. She said that if the Petitioner had chosen not to testify against Wood, he would have been tried, and the State would have sought the death penalty if he were convicted. When the post-conviction court asked counsel if any of the six attorneys representing Wood and the Petitioner ever discussed the likelihood of suppressing the Petitioner's statements to Investigator Chapman, she stated that this issue was never discussed.

Co-counsel, an assistant public defender with thirteen years of experience, testified that she met with the Petitioner seven times during the course of his case and that each of these meetings were documented in the jail records. She recalled a specific conversation she had with the Petitioner about the possibility of suppressing his statements:

I wanted to know when he gave all of those statements, did he understand that he didn't have to do that and that there were some potential issues that could be addressed with those [statements]. We didn't talk about it using the big words. I used words like your mom was there, maybe there's an issue with your momma being there. But again, that kind of cut both ways because he was eighteen. His mom was there. He had stated he wanted his mother there. But still in my mind, and especially with his demeanor, that perhaps that could have been somewhat comforting for him to have his mother there. There was the length of time of course that he had been detained and that he kept giving statements. There was that he had been to the hospital and that he had mentioned that he had smoked some marijuana earlier in the day, and I think maybe taken a couple of pills. I would have liked to have known if there was anything with that. But basically, I always preface this with when we're just talking about it at the very beginning that these are my thoughts on it. Am I going to promise you that we can win? Certainly, we can argue these issues. But it doesn't mean that that's going to resolve your case, and it's not going to mean it's going to resolve your case in this instance because there was some other independent evidence of what had transpired that night. I believe there was the video cameras at the gas store where they had captured the gasoline purchases [used to set the victims on fire], I think both occasions. There was that evidence that was subsequently coming in as we were discussing this case.

Co-counsel stated that when the State's offer was made, all three of the Petitioner's attorneys went to the jail to explain the offer and his options:

[D]uring that discussion, we talked about there were some motions that still needed to be filed. [The assistant public defender serving as first chair] went into great detail about if [the Petitioner] were to go to trial, these are some of the things that could be considered against you . . . . If the statement's out, this is what the evidence is going to be. If the statement stays in, then they're going to know everything, everything. And at that point, he decided that he was going to take that offer. And I mean we did have the deadline and he was going to testify against Mr. Wood.

Co-counsel said that she and the defense team talked to the Petitioner "at least twice" about suppressing his statements to law enforcement. She said that she was "bouncing things off of [the first chair attorney] about if we're going to do this motion [to suppress]" but that they had to wait to see if they were going to receive an offer from the State. As she was waiting to find out whether the Petitioner was going to receive an offer, she obtained the Petitioner's

-11-

school and medical records in the event the Petitioner chose to proceed to trial. She stated that the Petitioner's records indicated that he had a low birth weight. Co-counsel said there was "no question" in her mind that a suppression motion would have been filed and argued if the Petitioner had proceeded to trial. She said that even though the Petitioner's statements were important, he still could have lost at trial even if they had been suppressed. Co-counsel said that if the Petitioner had testified that he never remembered talking with his attorneys about suppressing his statements, he was mistaken.

When asked if she believed Investigator Chapman had promised the Petitioner anything in return for his telling the truth, she replied:

> I don't think it's that close. I really don't think it's that close. I think it's an issue, don't get me wrong. But I think if you look at the other side of the room and how that could be argued, I'm not sure that's the best argument. I think maybe if you put [several challenges to the statements] together, perhaps in the totality of the circumstances you might come out better. But again, we were going to file that motion [to suppress], but then [the Petitioner] wanted to take the offer and there was a deadline.

Co-counsel said that all of the Petitioner's attorneys informed him that if he decided not to accept the offer, they would file several motions on his behalf. In addition, they explained that it was the Petitioner's decision alone to decide whether to accept the State's offer or to proceed to trial. They told the Petitioner that there were problems with his case, with or without his statement. Co-counsel agreed that the potential suppression of the Petitioner's statements was one of the material things of which the Petitioner needed to be advised before making a decision about settling his case but asserted that all of the Petitioner's attorneys did their best to fully advise him on this issue prior to him entering his guilty plea.

Co-counsel said Dr. Pamela Abel tested the Petitioner and determined that his Intelligence Quotient (I.Q.) was not below seventy, which meant that he was eligible to receive the death penalty. She said the defense also wanted the Petitioner's I.Q. for suppression purposes so that they could argue he might not have understood his Miranda rights.

Following the conclusion of the evidentiary hearing, the post-conviction court entered an order denying relief. In its findings of facts, the court determined that law enforcement initially believed and later confirmed that Desere Thornton and her two sons, Jerrod and Anthony Thornton, died in a house fire; that Matthew Wood, a classmate of Jerrod Thornton had threatened to kill Jerrod because he thought Jerrod was in a relationship with Wood's ex-girlfriend, that Wood and the Petitioner had filled a gas can with gasoline the night of the

-12-

house fire, and that Wood and the Petitioner had been treated for burn injuries the night of the fire. The court found that "Investigator Chapman apparently believed and tried to convince [the Petitioner's mother] and [the Petitioner] that Matthew Wood was the only one with a motive to hurt Jerrod Thornton and his family and that [the Petitioner] might be an important witness about what had happened, rather than being a principal offender."

As to the Petitioner's claim that Investigator Chapman coerced him into making his confession, the post-conviction court made the following findings of fact and conclusions of law:

> If Investigator Chapman had in fact known then what he later learned from [the Petitioner], the Court might could conclude that Chapman was deceptive in trying to convince [the Petitioner's mother] and [the Petitioner] that they needed [the Petitioner] as a witness instead of planning to charge him as a principal offender. The conduct of law enforcement, however, must be judged by what they knew or what reasonable officers should have known at that time. As previously stated, the evidence and reasonable inferences therefrom show that the officers were developing a case against Matthew Wood and seeking the assistance of [the Petitioner], who at least knew something about the gasoline and had burns on his body.

> It was not until [the Petitioner's] mother convinced him to help the officers that the officers in fact learned that Wood had told [the Petitioner] he intended to kill them and that [the Petitioner] was present and helping by providing the knife, by following Wood into the residence, and by helping get one or two of the bodies back into the house before the house was set on fire. It appears that the officers were surprised to learn that [the Petitioner] was so involved in the cutting and stabbing that he had blood of the victims over his clothing to the extent that he stripped to his boxers and threw his bloody clothes into the house, before it was set on fire. The officers had no such knowledge at the time they talked with [the Petitioner's mother] and urged her and her son to give them information as a witness against Matthew Wood.

> The appropriate Miranda warnings were given, and it is clear that [the Petitioner] understood that he was knowingly, freely, and voluntarily waiving his rights against self-incrimination by providing evidence about what Mr. Wood had done. Unfortunately for [the Petitioner], the complete story made [the Petitioner's] conduct far more culpable than anyone believed in the early stages of the investigation. Law enforcement officers did not know of the cutting and stabbing before [the Petitioner] told them. They essentially

-13-

believed Mr. Wood had set the home on fire without any idea of a knife attack on each victim.

As to the Petitioner's claim that counsel provided ineffective assistance in failing to properly research and investigate the potential suppression of his statements and in failing to advise the Petitioner of potential suppression issues and their impact on trial, settlement, and appeal, the post-conviction court made the following findings of fact and conclusions of law:

[The Petitioner] testified at the PCR hearing that [counsel,] the Public Defender, was the attorney most involved in representing him. He testified he had a second degree burn on his right leg and was at the hospital for an hour or so before meeting Investigator Chapman at the jail. [The Petitioner] testified that [counsel] never told him about the possibility of suppressing his statements.

[Counsel] was the next witness and testified that she met with the Petitioner a total of forty-six times between her appointment and the trial court's acceptance of his pleas of guilty. While she did not have specific notes or specific recollections of each such meeting and the detailed discussions between her and her client, she believed that they discussed many of the details about the statements and the customary procedures of attempting to suppress such statements and what their chances for success were. [Counsel's] testimony was followed by that of her assistant, [co-counsel], who testified that she met with [the Petitioner] seven times and that another assistant [public defender,] who has since retired and moved to Florida, was in several discussions with [the Petitioner], [counsel], and [co-counsel]. [Co-counsel] specifically recalled discussing with [the Petitioner] several ways of attacking the statements and her belief that none of them were likely to succeed.

The third interview transcript, part of Exhibit 1, takes place at the smoldering remains of the Thornton residence and is also represented on a video admitted as Exhibit 7. All of these audio and written statements, accompanied by the video, show that the officers were careful in advising [the Petitioner] of his rights and establishing that he understood those rights and that [the Petitioner] was voluntarily waiving those rights, largely at the encouragement of his mother. In fact, the first incriminating evidence provided by [the Petitioner] was a statement written by his mother when he and his mother were outside the immediate presence of law enforcement officers. The overall context of the interviews and the appearance of [the Petitioner] in

-14-

the video shows a generally non-coercive environment and [the Petitioner's] ability to communicate with officers in an intelligent, mature, and cool manner.

The Court further finds that defense counsel, before the pleas, spent plenty of time investigating the case, studying thousands of pages of discovery material, evaluating possibilities of suppressing the incriminating statements by their client, and discussing with him the way such statements might be attacked in court and the chances, or lack thereof, of succeeding in the trial court or on appeal. This Court, which also served as the trial court for pre-trial motions and acceptance of guilty pleas, sees no basis by which defense counsel could have successfully suppressed [the Petitioner's] statements. The Petitioner has failed to carry his burden of proof in convincing this Court that the statements were constitutionally defective and would have been subject to suppression. He also fails to prove that trial counsel were ineffective in investigating, researching, failing to attempt suppression, or failing to explain all of those potential procedures and likely outcome[s] to their client. Therefore, there is no merit to the petition, as amended, and the Petitioner is not entitled to any relief in this post-conviction relief proceeding.

## ANALYSIS

**I. Coerced Confession.** The Petitioner argues in his post-conviction petition and appears to argue in his brief that his confession was involuntary because it was coerced. He claims that the record preponderates against the post-conviction court's finding of fact that Investigator Chapman believed the Petitioner was simply a witness and not a principal in the crimes at the time he told the Petitioner and his mother that the Petitioner would be a witness if he told him what he knew about the crimes.

It is well established that a defendant, following entry of a guilty plea, is precluded from arguing that his confession was coerced because this claim relates to the deprivation of constitutional rights that occurred prior to entry of the guilty plea:

Once a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel did not meet appropriate standards.

-15-

State v. Hodges, 815 S.W.2d 151, 153 (Tenn. 1991) (emphasis added) (citing Tollett v. Henderson, 411 U.S. 258, 266-67 (1973)); see McMann v. Richardson, 397 U.S. 759, 774 (1970) (holding that a defendant requesting federal habeas corpus relief who claims his confession is coerced "is bound by his plea and his conviction unless he can allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act"); Tenn. R. Crim. P. 37(b). Although the issue of whether the Petitioner's confession was coerced was addressed both by the post-conviction court and the State on appeal, we decline to consider this issue on its merits. Instead, we will only consider whether the Petitioner's confession was coerced to the extent that it relates to his claim of ineffective assistance of counsel.

**II. Ineffective Assistance of Counsel.** The Petitioner contends that counsel rendered ineffective assistance in failing to properly investigate suppressing one or more of his statements, in failing to advise him of the possibility of suppressing his statements, and in failing to inform him of the likelihood of suppressing them prior to entry of his guilty plea. He specifically claims that counsel should have considered whether Investigator Chapman coerced his statements by telling him that he would be a witness. The Petitioner also claims that counsel's errors rendered his guilty plea involuntary.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v.

State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). In order to satisfy the "prejudice" requirement in the context of a guilty plea, the petitioner must show that, but for counsel's errors, he would not have entered his guilty plea and would have proceeded to trial. Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004) (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

The Petitioner claims the record preponderates against the post-conviction court's finding of fact that his attorneys "spent plenty of time . . . evaluating possibilities of suppressing the incriminating statements by their client, and discussing with him the way such statements might be attacked in court and the chances, or lack thereof, of succeeding in the trial court or on appeal." The Petitioner claims that counsel testified that she was not aware of the first chair attorney having any discussions with the Petitioner about the ways in which his statements could be challenged in a suppression motion or about the likelihood that his statements would be suppressed. In addition, he claims counsel admitted that she did not have any discussions with him about suppressing his statements and acknowledged that during the year-long representation, none of the attorneys assigned to his case evaluated the possible suppression of his statements because to do so would have required "extensive research" that had not yet been conducted. Moreover, the Petitioner asserts that none of his attorneys recognized that his confession was coerced based on Investigator Chapman's promise that he would be a witness if he told him what he knew about the crimes. Finally, he claims that aside from the physical and forensic proof, most of the State's evidence

regarding the crimes came directly from his statements to law enforcement and that given the importance of these statements, his attorneys should have properly investigated and advised him of the possible suppression of them.

The record fully supports the post-conviction court's holding that counsel were not deficient. Counsel, who met with the Petitioner forty-six times, testified that she had discussed the possibility of suppressing the Petitioner's statement with him prior to his entering his guilty plea. She stated that the defense team was prepared to file forty-five to fifty additional motions, including a motion to suppress, if the Petitioner proceeded to trial. Although she believed that Investigator Chapman did not coerce the Petitioner into giving the statements, she said she would have made Chapman's comments about the Petitioner being a witness "as big a suppression issue" as possible if the Petitioner had decided to go to trial. Counsel stated that she and the other two attorneys assigned to the Petitioner's case explained the possibility of suppressing his statements and explained how the suppression of his statements related to his decision to enter guilty pleas. She noted that aside from the Petitioner's statements, there was other substantial evidence against the Petitioner, including physical evidence of the house that burned down and the victims' bodies, circumstantial evidence that the Petitioner and Wood were treated for burns shortly after the offenses, forensic evidence regarding the victims' cause of death, and evidence from the Petitioner's classmates regarding the friendship between the Petitioner and Wood and regarding Wood's motive to hurt the older child victim and his family. Counsel stated that accepting the State's offer of life imprisonment without parole was the best way for the Petitioner to avoid a sentence of death. She also stated that she did not believe the defense would have been able to suppress the Petitioner's statements to law enforcement if he had proceeded to trial.

Co-counsel, who met with the Petitioner seven times, testified that she and the defense team planned to challenge the voluntariness of the Petitioner's statement by attacking all the circumstances surrounding his confession, including but not limited to his mother's presence during the interviews, the length of time he had been detained, and the possibility that the Petitioner was under the influence of marijuana or pain medication at the time he gave his statements. See State v. Turner, 30 S.W.3d 355, 359 (Tenn. Crim. App. 2000) (stating that the court must look at the totality of the circumstances when evaluating the voluntariness of a waiver of the right to silence). Although co-counsel did not believe that Investigator Chapman's comments to the Petitioner about being a witness were coercive, she planned to include this issue along with several other issues in challenging the voluntariness of the Petitioner's statements. She asserted, however, that even if the Petitioner's statements had been suppressed, substantial independent evidence of his guilt remained, including the video recordings showing the Petitioner and Wood buying gasoline two different times on the night of the crimes. Co-counsel stated that after they received the offer from the State, all three attorneys discussed with the Petitioner what the evidence against him would be, with or

without his statements. She maintained that the Petitioner's attorneys talked to him "at least twice" about the possibility of suppressing his statements before he entered his guilty pleas. Co-counsel stated that there was "no question" that a suppression motion would have been filed if the Petitioner had proceeded to trial; however, she noted that the Petitioner still could have been convicted of first degree murder even if his statements had been suppressed.

In its order denying relief, the post-conviction court accredited counsel's and co-counsel's testimony over the Petitioner's testimony on this issue, and we agree that the Petitioner failed to show that his attorneys' performances were deficient.

The record also supports the post-conviction court's finding that the Petitioner was not prejudiced by any alleged deficiencies of counsel. Although the Petitioner claimed that he was prejudiced by counsels' failure to consider whether his statements were coerced by Investigator Chapman's promise to make him a witness, the post-conviction court held that the Petitioner was properly advised of his Miranda rights prior to giving his statements, that the Petitioner's statements were voluntary, and that a suppression motion would not have been successful because his statements were not constitutionally defective.

The transcripts of the Petitioner's interviews prior to his confession show that although Investigator Chapman talked to the Petitioner about being a witness, he never promised the Petitioner that he would not be prosecuted and never promised a specific or alternative sentence. Instead, Investigator Chapman merely indicated that Matthew Wood was the primary suspect in the case because he had the motive to hurt the victims and that he needed a witness to determine the extent of Wood's crimes. He also stated that it would be better for the Petitioner to be a witness at trial rather than to lie and claim that he and Wood received their burns from a bonfire at a different location. In addition, he explained that the Petitioner would be considered a principal if he did not tell the truth about what happened. See State v. Lesergio D. Wilson, No. M2012-00500-CCA-R3-CD, 2013 WL 3148279, at *5-7 (Tenn Crim. App. June 18, 2013), perm. app. denied (Tenn. Oct. 17, 2013) (concluding that the detective's comments to the defendant that "the only way in a situation like this for you to help yourself is to tell the truth" and his statements about an inmate who received the death penalty because the inmate did not talk to police but her co-defendant did were neither enforceable promises of leniency nor coercive); State v. Jamaal Eddie, No. W2011-00966-CCA-R3-CD, 2012 WL 2307022, at *12 (Tenn. Crim. App. June 18, 2012) (concluding that an officer's comments to the defendant that he believed that the defendant would be charged with first degree murder and that the "the only thing [the defendant] could do was tell and help him[self]" were equivocal and did not render the defendant's confession involuntary). Investigator Chapman also warned that if the Petitioner did not tell him what happened, Wood might claim that the Petitioner was primarily responsible for these crimes. These comments appear to have stemmed from Investigator Chapman's informed belief, based on

the evidence that had already been discovered, that the Petitioner would be charged as a principal if he did not tell the truth about his involvement in the crimes. We note that "'[t]ruthful statements about [a defendant's] predicament are not the type of "coercion" that threatens to render a statement involuntary.'" See State v. Smith, 933 S.W.2d 450, 456 (Tenn. 1996) (quoting United States v. Pelton, 835 F.2d 1067, 1073 (4th Cir. 1987)).

We also must consider the following portion of the Petitioner's interview, which he claims is particularly coercive:

| | |
|---|---|
| Investigator Chapman: | What you need to be scared of is not telling us the truth. That, that's what will really harm you. |
| [The Petitioner]: | OK. What's the consequences? |
| Investigator Chapman: | You'll be a state[] witness. They'll be, they'll have to keep you safe. |
| [The Petitioner]: | Safe what do you mean by . . . ? |
| Investigator Chapman: | I mean some of this boy's family is not and you . . . it's, you, you know. You're gonna have to tell me what happened before I can really totally answer that question; but you're in jeopardy of ruining your life for something that I think Matthew is responsible for. It's not your girlfriend; it's his. Don't, don't throw the rest of your entire life down the drain for somebody that . . . you really can't help at this point. |
| [The Petitioner]: | Well I don't want to ruin my life. |
| Investigator Chapman: | Not asking you to ruin yours; I'm asking you to do yourself some good. |
| [The Petitioner]: | Well I didn't [inaudible]. |
| Investigator Chapman: | Well you know . . . tell me what did happen. |
| [The Petitioner]: | Darn. |

-20-

[The Petitioner's mother]:   You're letting your pride . . .

[The Petitioner]:   I know mom.

[The Petitioner's mother]:   keep you from being a snitch now . . . spill it.

[The Petitioner]:   I will just, let me . . . it's hard to do that OK.

[The Petitioner's mother]:   No it ain't.

Investigator Chapman:   I know it's hard to do . . .

[The Petitioner]:   It's hard to do that to your [inaudible]

Investigator Chapman:   you, you, think it's hard.

[The Petitioner]:   [inaudible] it's different.

[The Petitioner's mother]:   You'll think he befriend you, well . . .

Investigator Chapman:   He'll turn on you like a snake.

[The Petitioner]:   I . . .

Investigator Chapman:   If he can put it on you, he'll put it on you. I have enough information to

[The Petitioner's mother]:   What's more important your friends or your family?

Investigator Chapman:   pretty much know I need to be talking to you, because you're more of a witness than anything else.

[The Petitioner]:   All right . . . I'm gonna tell you what happened; and hopefully I don't go somewhere I'm not supposed to be going. Matthew got mad at the dude 'cause he heard that uh . . . his girlfriend, his ex-girlfriend was hanging out with uh, uh, what's

-21-

|                        | that last name again . . . one that died or whatever? |
|------------------------|-------------------------------------------------------|
| Investigator Chapman:  | Rodriguez.                                             |
| [The Petitioner]:      | Yeah, Rodriguez, and we went over there and he was thinking about something. I was sitting in the truck . . . and he's like man I'm [going to] go in here and do something to this kid; and like I was like dude . . . I don't know, and he went over there and broke in the front window; and he murdered everybody. |

We conclude that the comments Investigator Chapman made in the excerpt above were, at most, equivocal. Investigator Chapman told the Petitioner that if he told the truth, he'd be "a state[] witness" and "they'll have to keep you safe." However, when the Petitioner asked him what that meant, Investigator Chapman indicated that the State would keep him safe from the victim's family and then said, "You're gonna have to tell me what happened before I can really totally answer that question[.]" Later, the Petitioner acknowledged the equivocal nature of Investigator Chapman's response when he stated, "I'm gonna tell you what happened; and hopefully I don't go somewhere I'm not supposed to be going." Compare Smith, 933 S.W.2d at 456 (concluding that a social worker's comments to the defendant that he might not be prosecuted if he were truthful and received counseling could not reasonably be interpreted as a promise that he would not be prosecuted and were insufficient to render his later statement involuntary), and State v. Kelly, 603 S.W.2d 726, 729 (Tenn. 1980) (holding that the evidence did not preponderate the trial court's finding that the officer's promise to ask the prosecutor not to oppose probation was "too indefinite and insubstantial to overbear the defendant's will to resist and bring about a confession not freely self-determined"), with Ford v. State, 201 S.W.2d 539, 542 (Tenn. 1947) (noting that the officer's statement to a defendant in custody that the prosecution would not ask for "the electric chair" if he confessed was coercive and rendered the defendant's statement involuntary). Significantly, Investigator Chapman never promised the Petitioner that he would not have to serve any time in jail if he told the truth; instead, he merely stated that the Petitioner would serve as a witness, a capacity regularly served by defendants who testify against co-defendants at trial. Because we do not believe that Investigator Chapman's comments to the Petitioner would have resulted in the suppression of these statements, the Petitioner has failed to show that counsel's supposed failure to pursue this issue prejudiced his case. Moreover, the record shows that there was substantial evidence, independent of the Petitioner's statements, that could have led to his convictions for first degree murder. Accordingly, we conclude that the Petitioner has failed to establish that his attorneys'

performances were deficient or that he was prejudiced by any deficiency. Because counsel provided effective assistance in this case, the Petitioner is not entitled to relief on his claim that counsels' errors rendered his guilty pleas involuntary.

As a final note, the judgments in this case do not reflect the merger of the first degree premeditated murder convictions with the surviving first degree felony murder convictions. See State v. Kiser, 284 S.W.3d 227, 234 n.2 (Tenn. 2009) (recognizing that multiple convictions for first degree murder involving a single victim should be merged into a single judgment of conviction); State v. Cribbs, 967 S.W.2d 773, 788 (Tenn. 1998) (stating that "when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction for first degree murder"); State v. Jose L. Hidalgo, No. M2011-01314-CCA-R3-CD, 2013 WL 1197726, at *11 (Tenn. Crim. App., at Jackson, Mar. 26, 2013) (holding that "the proper practice is to enter only one judgment form with a notation therein that the alternative count is merged"). Therefore, we vacate the judgments in counts 1 through 6 and remand the case for entry of three judgments of conviction showing that count 1 was merged with count 4, count 2 was merged with count 5, and count 3 was merged with count 6.

## CONCLUSION

The judgment denying post-conviction relief is affirmed. Because the judgments of conviction in this case fail to reflect the merger of the first degree premeditated convictions with the first degree felony murder convictions, the judgments in counts 1 through 6 are vacated and the case is remanded for entry of three judgments of conviction showing that counts 1, 2, and 3 were merged with the surviving judgments in counts 4, 5, and 6.

_____
CAMILLE R. McMULLEN, JUDGE